# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Tasha Callahan, individually and on behalf of all others similarly situated, | 1:23-cv-02072 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| The Procter & Gamble Company, | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.      The Procter & Gamble Company ("Defendant") manufactures Gain detergent marketed as sufficient for 32 loads of laundry ("Product").

 

2.      Telling purchasers that the Product contains enough detergent for 32 loads of laundry

is a form of usage-based pricing.

3.    This is in contrast to measure-based unit prices, which express cost in cents or dollars per unit of measure, e.g., ounces.

4.    When confronted with the range of prices and package sizes, consumers rely on information that is the easiest to understand to choose the best value.

5.    In the context of products like detergent, measure-based unit pricing makes it difficult for consumers to evaluate how much they are getting relative to price.

6.    Similar to how a disclosure about how many servings a bulk food item can provide, number of wash loads "serves as a more [accurate] diagnostic indicator of product value" compared to how many ounces or liters it provides.[1]

7.    According to Lembregts et al., the "numerosity effect" dictates that when consumers assess differences between presentations of quantities in Arabic numerals, they focus on the magnitude of the numeric component in light of the default unit for the particular category.[2]

8.    Whether referring to the number of chocolates in a box or bedrooms in a mansion, such figures are expressed in full units, similar to how metric and imperial units of measurement are expressed, such as meters, liters, grams, feet, ounces and pounds.

9.    The same principles apply when evaluating detergent, as consumers understand the usage-based unit of "loads" to refer to "full loads" of laundry.

10.    This understanding was confirmed by the Department of Energy, which concluded that there was a direct relationship between capacity and maximum load.

---

[1] Robert J. Kwortnik Jr, Elizabeth H. Creyer, and William T. Ross Jr. "Usage-based versus measure-based unit pricing: is there a better index of value?" Journal of Consumer Policy 29.1 (2006): 37-66.

[2] Christophe Lembregts and Mario Pandelaere. "Are all units created equal? The effect of default units on product evaluations." Journal of Consumer Research 39.6 (2013): 1275-1289.

11.    It relied, in part, on how washing machine manufacturers generally instruct users to load them "to the point that the clothes container is loosely filled," to take advantage of its whole usable capacity.

12.    Though the numerosity effect directs the purchaser's attention to the "32," understood as the "usage-based" unit for detergent, loads, only a much closer inspection would reveal what looks to be a small diamond after the word "loads ◊."

13.    Only if the container is turned around and the consumer navigates hundreds of words, including warnings, ingredients, logos and icons, in varying sizes, fonts, colors and languages, could they eventually see that small shape from the front, had they noticed it in the first place.

14.    This would tell them that the Product "◊ Contains approximately 32 loads as measured just below bar 1 on cap," which is the smallest size load possible, even though this is referred to as "Medium," compared to the "Large Loads" at "Bar 3" and "Full Loads" at "Bar 5."



15.    That consumers would not expect loads of laundry to refer to the smallest possible amount of laundry they could put in their washing machine was confirmed by "[U]npublished data from [Procter & Gamble] [which] indicate[d] that [64 percent of] North American households" do large or very large loads of laundry, while only 21 percent do medium loads.[3]

16.    A survey by California utility companies replicated these findings across consumers, with 59 percent or 180 (of 310) loads of laundry categorized as large or very large, more than double the loads characterized as medium, and almost six times the number of loads classified as small, at eleven percent.[4]

**Table 5: Relative Load Sizes**

| Load Size | Response Count (# loads reported) | Percentage of Total |
|---|---|---|
| Very small | 8 | 3% |
| Small | 34 | 11% |
| Medium | 88 | 28% |
| Large | 138 | 45% |
| Very Large | 42 | 14% |
| **Total** | **310** | **100%** |

Source: PG&E 2016 Survey.

17.    The tendency towards filling up a washing machine is not limited to the United States.

18.    A 2015 study of over 2,000 Europeans found that roughly 74 percent used the full capacity of their washer.

---

[3] Darius Sabaliunas, et al. "Residential energy use and potential conservation through reduced laundering temperatures in the United States and Canada," Integrated Environmental Assessment and Management: An International Journal, 2.2 (2006), 142-153; Jay S. Golden, et al. "Energy and carbon impact from residential laundry in the United States," Journal of Integrative Environmental Sciences, 7.1 (2010), 53-73.

[4] Comment, California Investor-Owned Utilities ("CA IOUs"), Energy Conservation Program: Test Procedures for Residential and Commercial Clothes Washers, 85 Fed. Reg. 38106 (proposed rule, June 25, 2020) (to be codified at 10 C.F.R. Parts 430 and 431), Docket No. EERE-2016-BT-TP-0011.

19.     Consumer laundry habits in favor of larger loads has increased over the past ten years, as they have become aware of the effects of energy consumption on climate change.

20.     CNN surveyed laundry and environmental experts, who recommended that Americans "save up [their] dirty clothes and wash them in a few big loads versus several smaller loads" to mitigate the environmental impact.[5]

21.     The majority of Americans who take advantage of the whole usable capacity of their washing machines will not be able to do 32 loads of laundry, because if they fill the cap to Bar 5, corresponding to "Full Loads," they will only be able to do one-third as many.

22.     Even if consumers fill the cap to Bar 3 for "Large Loads," they will get close to half as many as the 32 indicated on the front label.

Jurisdiction and Venue

23.     Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

24.     The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

25.     Plaintiff is a citizen of Illinois.

26.     Defendant is a citizen of Ohio.

27.     The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

28.     The members of the class Plaintiff seeks to represent are more than 100, because the Product is sold with the representations described here in thousands of stores, such as grocery

---

[5] Leah Kirts, How to Wash Laundry Sustainably, According to Experts, CNN Underscored, August 23, 2022.

stores, dollar stores, big box stores, drug stores, warehouse club stores, convenience stores and online, in the States Plaintiff seeks to represent.

29.     Venue is in this District with assignment to the Eastern Division because Plaintiff resides in this Lake County and a substantial part of the events or omissions giving rise to these claims occurred in Lake County, including her purchase and use of the Product, reliance on the identified statements and omissions, and subsequent awareness these were false and misleading.

Parties

30.     Plaintiff Tasha Callahan is a citizen of Waukegan, Lake County, Illinois.

31.     Defendant The Procter & Gamble Company is an Ohio corporation with a principal place of business in Cincinnati, Ohio, Hamilton County.

32.     Plaintiff purchased the Product at one or more stores of the type consumers buy household staples in, including but not limited to dollar stores, grocery stores, convenience stores and/or drug stores, such as the Walgreens in Waukegan and Walmart in Gurnee, between 2021 and 2023, among other times.

33.     Plaintiff read and relied on the number of loads on the front label, i.e., "32," which she believed was relevant to her as a typical American who does full or large loads of laundry.

34.     Plaintiff did not read the back of the container which distinguished between medium and large loads, and was unaware that to do the number of loads of laundry on the front label required that those loads be "medium."

35.     Plaintiff was unable to do the number of loads of laundry promised by the front label number, as she was only able to do no more than half as many as this number.

36.     As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than $7.49 for 46 oz (1.36 L), excluding tax and sales, higher

6

than similar products represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

37.     Plaintiff bought the Product at or exceeding the above-referenced price.

38.     Plaintiff paid more for the Product than she would have had she known she would not be able to do more than between one-third and half of 32 loads indicated on the front label, or would not have purchased it.

39.     The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

40.     Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, features, and/or components.

41.     Plaintiff intends to, seeks to, and would purchase the Product again when she can do so with assurances the number of loads of laundry it can be used for is consistent with her understanding and how most consumers like her do laundry.

42.     Plaintiff is unable to rely on the labeling of not only of this Product, but other detergents which make prominent claims about the number of loads of laundry they can be used for, because she will be unsure of whether those representations are truthful.

43.     If Defendant was compelled to truthfully disclose the number of loads of laundry the Product could be used for, Plaintiff would have more confidence in the promises of other detergents which make such statements.

<u>Class Allegations</u>

44.     Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons excluding Judges who may hear this action, their immediate families and direct staff, in the State of Illinois who purchased the Product during the statutes of limitations for each

cause of action alleged; and

**Consumer Fraud Multi-State Class**: All persons in the States of North Dakota, Montana, Idaho, Alaska, Kansas, Mississippi, and Utah who purchased the Product during the statutes of limitations for each cause of action alleged.

45.     Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

46.     Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

47.     Plaintiff is an adequate representative because her interests do not conflict with other members.

48.     No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

49.     Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

50.     Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

51.     Plaintiff seeks class-wide injunctive relief because the practices continue.

Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, *et seq.*
(Illinois Class)

52.     Plaintiff incorporates by reference all preceding paragraphs.

53.     Plaintiff saw and relied on the label which stated she could do the specified number of loads of laundry, and like most Americans, she did not do small loads, because she filled her washing machine to the point that the clothes container was loosely filled, to take advantage of its

8

whole usable capacity, which meant the number of loads of laundry she was able to do did not exceed half of the 32 indicated on the front label.

54.     Defendant's false, misleading, and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions, because value is important to consumers like Plaintiff.

55.     Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts
(Consumer Fraud Multi-State Class)

56.     The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

57.     The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

58.     Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, which they did, suffering damages.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

59.     The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that she could do the specified number of loads of laundry, and like most Americans, she did not do small loads, because she filled her washing machine to the point that the clothes container was loosely filled, to take advantage of its whole usable capacity, which meant the number of loads of laundry she was able to do did not exceed

half of the 32 indicated on the front label.

60. Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions, and targeted digital advertising.

61. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires, because of its research into how Americans do laundry, and seek value for their money.

62. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that she could do the specified number of loads of laundry, and like most Americans, she did not do small loads, because she filled her washing machine to the point that the clothes container was loosely filled, to take advantage of its whole usable capacity, which meant the number of loads of laundry she was able to do did not exceed half of the 32 indicated on the front label.

63. Defendant's representations affirmed and promised that she could do the specified number of loads of laundry, and like most Americans, she did not do small loads but at least large loads, which meant she could only do half as many.

64. Defendant described the Product so Plaintiff believed she could do the specified number of loads of laundry, and like most Americans, she did not do small loads, because she filled her washing machine to the point that the clothes container was loosely filled, to take advantage of its whole usable capacity, which meant the number of loads of laundry she was able to do did not exceed half of the 32 indicated on the front label, which became part of the basis of the bargain that it would conform to its affirmations and promises.

65. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

66. This duty is based on Defendant's outsized role in the market for this type of Product, owners of the Gain brand, which consumers have associated with value and quality for decades.

67. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

68. Plaintiff provided or provides notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's warranties.

69. Defendant received notice and should have been aware of these issues due to its own internal data collection, complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

70. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

71. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because it was marketed to Plaintiff as if it could do the specified number of loads of laundry, and like most Americans, she did not do small loads but at least large loads, which meant she could do no more than half as many.

72. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected that it could do the specified number of loads of laundry, and like most Americans, she did not do small loads but at least large loads, which meant she could do no more than half as many, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

Negligent Misrepresentation

73.    Defendant had a duty to truthfully represent the Product, which it breached.

74.    This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, as custodians of the Gain brand, which Americans have trusted for decades with washing their clothes.

75.    Defendant's representations regarding the Product went beyond the specific representations affixed to package, as they incorporated its extra-labeling promises and commitments to quality, as one of the oldest and trusted brands of detergent.

76.    These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

77.    The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

78.    Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, her purchase of the Product.

Fraud

79.    Defendant misrepresented and/or omitted the attributes and qualities of the Product to Plaintiff, that it could do the specified number of loads of laundry, and like most Americans, she did not do small loads, because she filled her washing machine to the point that the clothes container was loosely filled, to take advantage of its whole usable capacity, which meant the number of loads of laundry she was able to do did not exceed half of the 32 indicated on the front label.

80.    As a leading seller of detergent, Defendant is aware of how consumers do laundry and that most of them do large or very large loads, not small loads.

81. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity or deception, through statement and omission, of the representations.

82. Defendant knew of the issues described here yet did not address them.

83. Defendant's fraudulent intent is evinced by its knowledge that the Product could not be used for the number of loads of laundry indicated, but at most for half as many as that number.

<u>Unjust Enrichment</u>

84. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

 **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Awarding monetary, statutory and/or punitive damages and interest;

4. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

5. Other and further relief as the Court deems just and proper.

Dated:   April 1, 2023

Respectfully submitted,

 /s/ Spencer Sheehan
Sheehan & Associates, P.C.

13

60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com